The next case on the calendar for today is No. 20-3704, United States v. Smith No. No government. I think it's the government. Good morning. This case involves a plea, actually, so that we could appeal rather than entering into a plea agreement where the government mandates that you waive appeal. So we pled to the offense as opposed to pleading to the offense with acceptance and responsibility and lowering the guideline sentence. In this case, what we have is a situation where this young lady was the cousin of Dalvin Curry, one of the main targets of a RICO prosecution of gangs in the city of Buffalo. During the time of this indictment, the U.S. Attorney's Office in the Western District of New York undertook a number of prosecutions of street gangs under RICO, and this was one of them. I was involved in four of them, the Kingsmen, the 7th Street Gang, the Bailey Boys, and the Rounds Crew. They all involved drugs and murder and shooting. So this just was one of them, and Dalvin Cook was one of the major people. He was also the cousin and had lived with Shanna Smith at their residence for many, many years. Shanna had a drinking problem and a drug problem. That's seen throughout that. She talks about, at times, about being drunk when she makes statements to police and doesn't remember things. She gets a grand jury subpoena, but it's just a flat subpoena. It's not a subject subpoena or a target subpoena. I think that distinction is important because Shanna Smith at first told them that she was the alibi witness for Dalvin Cook on the December 5th incident, and then she recants it when they said they had video and film, and then voluntarily she says, I was there on New Year's Eve when Xavier Wines got murdered, and my cousin Dalvin didn't have anything to do with it. Now, why I say that it's important that they gave her a flat subpoena is because they didn't tell her, in that flat subpoena, like the Department of Justice handbook suggests, that she could be a subject or she may be a target. And- But she was not a subject or a target, right?  She's only eventually is charged with perjury because of her conduct before the grand jury. Yeah, I understand that, but if you look carefully at the questions of Assistant US Attorney Molisani, you'll see at the appendix page 73, him ask this particular question as she's talking about the discovery of a gun that she says that they found as they walked along the sidewalk. And what he asks at that interval is, did you tell him to throw the gun into the bushes? Now that question is, if she did tell him to throw the gun into the bushes, she then becomes an accessory to the either obstruction of justice or hiding of a gun that was involved in a murder. So that may give her accessorial responsibility to that murder because she's telling him to hide the gun, to get rid of it. She answers no, but the question tells you that the US attorney knew about that question and asked it. And in many cases in the Western District, at least three, I've been appointed to represent what might look as fact witnesses once they go down to the magistrate, the magistrates in the Western District tend to appoint a CJA counsel if they can't afford an attorney so that they can have an attorney discuss the matters with them when they've declined to testify. Once they have the attorney and I tell them that they're a fact witness, let's go back in and go before the grand jury. The US attorney asks what they're going to testify to. They would flesh out what she knew about that New Year's Eve day. And that's important because she would have told him ahead of time the things that they asked during the grand jury. So this wasn't- She didn't have an attorney, no. Not with an attorney, but there was an interview with the prosecutors. She talked to the prosecutor, yes, but here's what happens. And it's at appendix 131 and 132, my appendix. It's the affidavit of the special agent who talks about what they talked about. She said, I don't want to testify. I don't want to testify. And the US attorney, instead of saying, do you want to go down to the magistrate? Do you want a counsel? Do you want to talk to somebody? He doesn't say that. He says, you have to testify. If you don't testify, I'm going to take you down to the magistrate and he will put you in jail until you testify. So can I ask, though, did the government have any reason to believe that she would lie, though? I mean, do we have to find for you that the government knew in advance that she would lie before a grand jury? If we're doing a sole perjury trap argument, I think that they would have to know that. But that would require, perhaps, a hearing or a factual determination. I think you could send it back for that kind of hearing, because they would have known. Because in every case, especially the RICO cases that I've been involved in, I get so much discovery. In the one case when it came to Jane's material, 3,500, so I got 10,000 pages, what? You just said they would have known she was going to lie? No, they would have known that she wasn't there. Because as soon as I became involved in this case, they sent me the videos of the parking lot. They would have gotten those videos immediately after the murder, or they might not have existed. But they did, they confronted her with that evidence and she changed her story and was no longer an alibi for the first murder, right? The first murder was on December 5th. When they showed her the videos from the first murder, she then recanted the story and told that he was gone for three hours. Now, in the second- So it's not like they kept the evidence in their back pocket and waited for her to lie. In the second one, they gave me videos of that parking lot where they would have walked along, and where 20 people would have been scampering around. And I looked at over an hour and a half worth of video and saw nothing. So they would have already have had that, because if you don't get the videos right away in the city of Buffalo, they seem to vanish. Polk cameras, outside videos, videos of, and I know that as soon as they have a murder, they would have gone right to the Buffalo Municipal Housing Authority and got every video they had. So they would have already had seen that. But regardless, let's say that they had seen a video, and let's say even that the video indicated that she wouldn't have been there. They still had an investigatory purpose for getting her testimony. Why? If they knew she wasn't there, and she said, I was at a party, and I know he wasn't involved in it. Okay, and if they knew she wasn't at the party, because that's what they say, and all of that. So your argument is that the prosecutors confronted her with the video of the first murder- I understand that, but they- In order to get her to recant her testimony. But even though they had the video of the second one, and showed them that she was not going to testify truthfully, they decided not to confront her with that one. That's right. Okay, and the evidence of that is, we should infer that because video evidence disappears quickly in the city of Buffalo, they would have had it. Yeah, they would have had it right away, and it would have told them conclusively that she wasn't there. But why didn't they tell her to go get, on those other arguments that I made, why didn't they just tell her, go get a lawyer? See, and a lawyer would have fairly- Are they obligated to do that? Maybe they should be. No, but they should be. But in a situation where they claim she's not a subject, but they ask, did you tell him to throw the gun into the bushes? You know darn well that they're trying to pull her into the conspiracy. So this is- Yeah, I'm arguing that she- You made an argument about a perjury trap, but now you're suggesting- No, I have two different arguments. The first section tells you that you should use the inherent powers and dismiss this because they violated her sixth and fifth amendments to the Constitution. That's what the first whole section is about. This last section is about a perjury trap. Okay, so I argued two different prompts. One prompt- Okay, I understand, but you're saying not only was it a perjury trap, they actually wanted to make her into an accomplice. It's a, she would do it in the last- But she was not, in fact, an accomplice. I mean, you just said- No, she's not. They had video, and they would have known that she wasn't even there. Right, but why- So they would have known that she wouldn't have instructed him to put the gun anywhere. Do you think they wouldn't have done something if she would have said, yes, I told them to put them in the bushes? Well, if they knew that it wasn't true, which is what you just said. I understand that, but they knew that it wasn't true, and yet they took this on and kept going with it. What they did here is Paul Parisi, if you'll notice the signature on the subpoena to the grand jury. He was the assistant US attorney who came forward and prepared the case. Who ended up going into the grand jury and presenting it was Seth Molisanti. Seth had just gotten there from the Erie County District Attorney's Office maybe a week or two before. So Paul Parisi, who used to be at the Erie County District Attorney's Office, sent Seth in to present this case, or at least this aspect of it. And I suspect that Paul knew all about these things and just sent Seth in there randomly. And I am very suspicious about this whole indictment. I've been doing this with that US Attorney's Office for 47 years. I've had some great US attorneys. I've had some that are loosey goosey. And this particular one, I'm very upset with. And right shortly thereafter, they had another one. And this one is the craziest perjury case I've ever seen. I think we have your argument, Mr. Stefanski. Okay, Judge Ager. You're reserved a few minutes for rebuttal. All right, okay. Ms. Gregory? I'm going to, first I'll pick this up a little bit. Okay. I guess I have to pick it up a little bit, or else we'll be- We're going to go up for it, we're going to be taking this back to Buffalo, aren't we? Yeah, I'll take it back to Buffalo, I'd like it. Good morning. May it please the court, Katherine Gregory, Assistant US Attorney representing the United States. This court should affirm the judgment. This case presents no reason to revisit established doctrine concerning the warnings given to grand jury witnesses or the so-called perjury trap defense. Simply put, the government's conduct here was not outrageous because it comported with this court's precedent and that of the Supreme Court. All Ms. Smith had to do was tell the truth. She was repeatedly advised, all you have to do is tell the truth. You can only get in trouble if you lie. She was put under oath. She affirmatively chose to perjure herself. I just want to go over the Fifth and Sixth Amendment arguments that Ms. Smith makes. Miranda warnings are not required for grand jury proceedings for a very specific reason. It is not a custodial interrogation. Supreme Court explained to Mondahano that the concerns that were present in Miranda, police custody, things like that, are not present at the grand jury. The Fifth Amendment is also not a license to commit perjury. So there's no outrageous conduct here in declining to give those warnings to Ms. Smith. The Sixth Amendment, that right to counsel, does not attach until the start of adversarial criminal proceedings. Ms. Smith was not under indictment. There was no complaint filed. She was not a target or a subject of the investigation. Can I ask, so she had previously lied to create a false alibi for her cousin on the night of one of the murders. Would that conduct have made her a potential subject? I don't see why it would have, and the government certainly didn't consider her a subject. She was an alibi witness, according to Mr. Curry. So therefore, her statement, one way or the other, was of great value, either as a defense for him or to show that he was trying to employ his cousin using a false alibi. And but if you had the video, what did you need her for? Well, she was an alibi witness, and she had said- But if, as you just said a moment ago, it could have shown that Mr. Curry was trying to use her as a false alibi, wouldn't that implicate her in criminal conduct if the prosecutors thought that she was coordinating with the suspect to provide a false alibi? Not necessarily, and certainly not in this case. What happened with it, and I think your honor has it correct, the Sullivan murder, she actually made a sworn statement that she later recanted, that she had been with him all night. The police showed her the video, and then she recanted, fine. Then on her own, she wasn't even asked about the Wimes murder. She just brought it up by herself, saying, and Curry's not responsible for that either. She was a reluctant witness. She was not very forthcoming. The grand jury decided to issue that subpoena to get her testimony as to those two murders. It was a very complex investigation. All she had to do was say- Did the prosecutors have that video that opposing counsel mentioned about the other murder? I do not know offhand, but I can tell you it wouldn't matter, because if she started to lie as soon as she started talking about that Wimes murder, and I'm not sure quite what Mr. Stokowski would have expected us to do, crack open our file and start playing videos for her while she's in the grand jury. But to develop that testimony, one video is not going to say whether or not she was at that party, and what else she saw. One video is not going to say whether there were 20 people off screen. And as we said in the affidavits attached to the motion in opposition, those facts did not come out until well after her grand jury testimony when enough people from that party had come forward and said, no, she wasn't there. And enough social media videos had been gathered after her testimony to say definitively, no, she was not there at all. So, the fifth and sixth amendments do not grant a grand jury witness a license to commit perjury. And this court recently explained in Prococo that there is no constitutional obligation to give an advice of rights form or a target letter to grand jury witnesses, and the failure to do that does not warrant dismissal of indictment. What about the question that Mr. Stokowski brought up about whether she instructed Curry to throw the gun in the bushes? But she didn't, and Mr. Stokowski conceded that. So she didn't do that, and therefore it wouldn't have been an incriminating statement. She wasn't there at all, and actually, Mr. Curry was still on the scene when police arrived. Presumably, I can only speculate, of course, but she was trying to come up with a reason that Mr. Curry's blood was on the gun. But again, if it wasn't an incriminating statement, I'm not sure how that could have been a trick question. As to, or rather, I don't know how that would have been something where she would have been forced to lie. All she had to do was either tell the truth, I wasn't there, or decline to say anything and invoke her Fifth Amendment right. Can you respond to the argument about her illegal seizure or the suggestion that she was intoxicated? Can you spend some of your time on that? Sure, I'll start with the one about the alcohol. During the testimony itself, the grand jury testimony, Ms. Smith denied that she was intoxicated.  The agent's affidavits refuted that after the fact assertion by saying that they didn't smell anything on her. They were in close proximity, she didn't look confused, no glassy eyes. The district court did not credit that assertion after the fact that she had been drinking. And most importantly, most significantly, she pled guilty. And as part of that allocution, she admitted that she knowingly gave false testimony to the grand jury. So there's nothing in the record other than that self-serving affidavit to indicate that she had been drinking. And this is an outrageous conduct allegation or an appeal, not a Rule 11 violation. She's not saying that she was drunk at the time or that she didn't know what she was doing. I think the argument is that the government's conduct was outrageous because somehow she had been drinking and we knew she had been drinking and put her in any way. But nothing in the record supports that. As to the allegation that she was absconded from her home, again, the affidavits from the law enforcement officers indicate that she didn't show up. They had tried calling. They went to the house. They were just trying to see if she was going to come, if she needed a ride perhaps, which is not uncommon in the city of Buffalo. And then she was taken to grand jury. The district court, again, did not credit any assertions that she had been kidnapped or taken away or seized in any manner. And the explanation given by the assistant U.S. attorney was a factual explanation of what would happen if she declined to comply with a grand jury subpoena. It was a simple, straightforward, if you don't want to testify, here's what will happen. In sum, there is no- Is that the normal practice? I wouldn't say that that's normal practice, and especially not where the person is not a target or a subject. Again, there's, and whether or not it's normal practice, in this particular case, this was an eyewitness. She was potentially an alibi eyewitness. And I will say, as we note in our motion, at the Curry trial, it did come up that he was trying to get his cousin to lie for him. It actually turned out to be a pretty big argument of consciousness of guilt that he was trying to get his cousin to create this false alibi. I think she even showed up to court one day. But, and I've lost my train of thought, Your Honor, but- I just interrupted you. Right, I wouldn't say that it was, no, I don't say that, I wouldn't say that that's normal practice. Now, I can't say what would have happened if she had kept insisting and said, you know what, no, Mr. Molisani, I do not want to testify. Let's go before that magistrate judge and see what happens. I don't know what would have happened if she went before the court, if it would have appointed counsel. It's all speculation. The long and short of it is, this court has never required, never created that constitutional obligation to give an advice of rights form, to give a target letter, to advise of the Miranda warnings. Which, again, it is not a custodial interrogation, it's a grand jury investigation. And there was no adversarial criminal proceeding. So there was no Sixth Amendment right to counsel yet. She created this situation when she chose to affirmatively start lying, despite knowing that the government did have some evidence that her initial alibi was false. She chose to roll the dice. There's no basis in this case to revisit that so-called perjury trap doctrine, or to revisit the warnings given to grand jury witnesses. The government's conduct was now outrageous by a long shot, and this court should affirm the judgment. Thank you. Thank you, counsel. Will there be a rebuttal? Yeah, we quit. Interestingly, there's a suggestion that at the trial, it came up that he was trying to influence his cousin to lie. Now, that tells me that they had a lot more information than they're depicting. And this wasn't just a mere case of giving her a ride. She didn't show up and the agents, agents, plural, showed up at her house. Nobody answered the door. They didn't stop. They kept coming. Her mother answered the door. She refused to come out. It's in the affidavits. And finally, she reluctantly agreed to go with them. When she got there, she didn't want to testify. They told her they're going to put her in jail. The magistrate will put you in jail until you talk. It didn't say that she didn't have to talk. They said the magistrate will put you in jail if you don't talk. So this court should fashion some sort of warning for even witnesses when they're reluctant, that the US attorney can't trample over people in order to get testimony, or in this case, in order to get lies. So sorry, so what should the US Attorney's Office have said in that? I think that they should, in all circumstances, at least say they should have a right to counsel. I mean, we've all said you don't have a right to counsel, but here's a person that has never been in trouble before. She- So your position is we should extend Sixth Amendment protection to witnesses? Yeah, I think at least we should warn them, yes. We should extend it, because in this day and age, we have people coming in to grand juries. Those are serious places. I mean, we don't let them go in the state. You can go into the grand jury with the witness and see what's going on. In the federal system, we sit outside the grand jury door, and if they have a question, they can come out and talk to us. That's happened to me in the past. But in our system, they don't even know they can have a lawyer with them. They can't discuss the case with them. They walk in and they've got FBI agents or DEA agents, and they take them over to the courthouse. In this case, they brought her to the US attorney who had her in a room and told her that she's going to go to jail if she doesn't cooperate. And so there she went. And she says she drank, there was one last point I wanted to make. She said there's no indication that she was drinking. Look at the end of the grand jury minutes. There were people on the grand jury that asked the US attorney to ask her if she'd been drinking. She told them that she wasn't, but she told me, and I was in her affidavit, that she drank a half a bottle of E&J brandy. So this is a terrible case, and this court should fashion remedies, not only for Shanna Smith, but for other defendants who are similarly situated. Thank you. Thank you, counsel. We'll take the matter under.